**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

WALTER AUTO LOAN TRUST;
AGORATRADE LLC; AGORATRADE
LLC as Trust Manager and Beneficiary of the          CASE NO.
Walter Auto Loan Trust; and AGORA
DATA, INC.

        Plaintiff,

vs.

TRACK MOTORS LLC dba TRACK
MOTORS and MBF FINANCE LLC.

        Defendants.
_____/

## VERIFIED COMPLAINT FOR DAMAGES AND PRELIMINARY INJUNCTION

Plaintiffs, WALTER AUTO LOAN TRUST, AGORATRADE LLC, AGORATRADE

LLC as Trust Manager and Beneficiary of the Walter Auto Loan Trust, and AGORA DATA, INC.

("Agora"), by and through undersigned counsel, sue Defendants, TRACK MOTORS LLC dba

TRACK MOTORS ("Track Motors") and MBF FINANCAL LLC (collectively "Defendants") and

alleges:

## INTRODUCTION

This action arises from the Defendants' breach of a Master Receivables Agreement ("MRA")

whereby Defendants would sell, transfer and assign to Agora a portfolio of auto retail installment

contracts ("RICs") originated by Defendants in exchange for a negotiated price.   In addition to

their breach of the MRA, Defendants tortiously and unjustifiably interfered with Agora's

relationships with the customers who purchased the vehicles related to the RICs by, among other

things, accepting payments from the customers that belonged to Agora, accepting return of the

vehicles purchased by the customers as voluntary repossessions and erroneously advising the

customers that their credit would not be impacted.   In addition to monetary damages, Agora seeks

specific performance and a preliminary injunction ordering Defendants to cease their continuing

CASE NO. 2016-CA-010362-O

material breaches and interference with Agora's business relationships that are resulting in significant harm to Agora and third parties.

## PARTIES, JURISDICTION & VENUE

1.      Agora Data, Inc., is a Delaware Corporation with its principal place of business in Arlington, Texas.   Agora Data, Inc. is the sole member and manager of AgoraTrade, LLC which is the Trust Manager and beneficiary of Walter Auto Loan Trust.   Walter Auto Loan Trust is a Delaware trust.   AgoraTrade, LLC is a Texas limited liability company with its principal place of business in Arlington, Texas.

2.      Defendant, Track Motors is a Florida limited liability company with its principal place of business located at 1590 S. State Road 7, Davie, Florida, 33317.

3.      Defendant, MBF Finance, LLC is a Florida limited liability company with its principal place of business located at 1771 S State Rd. 7, Ft. Lauderdale, FL 33317.

4.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      The Court has personal jurisdiction over Defendants as they are organized under Florida law and maintain their principal place of business in Fort Lauderdale, Florida.

6.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Southern District of Florida because a substantial part of the events or omissions giving rise to the claims occurred in Fort Lauderdale, Florida.

7.      Venue is appropriate in Fort Lauderdale, Florida, because this is the county where the Defendants reside and/or conduct business, where the causes of action accrued and where the property in dispute is located.

**LIEBLER, GONZALEZ & PORTUONDO**
Courthouse Tower - 25th Floor, 44 West Flagler Street, Miami, FL 33130    (305) 379-0400

## CONDITIONS PRECEDENT AND RETENTION OF COUNSEL

8.      All conditions precedent to this action have occurred, have been waived, or have been otherwise excused.

9.      Agora has retained undersigned counsel to represent its interests in this matter and has agreed to pay said counsel a reasonable fee for services rendered.

## GENERAL ALLEGATIONS

10.      Agora is a financial technology company that provides independent automobile dealerships and finance companies with loan performance analytics and affordable access to capital.

11.      Defendants operate an automobile dealership located in Fort Lauderdale, Florida engaged in the business of selling pre-owned automobiles and providing its customers financing for the purchase of automobiles.   When Defendants' customers purchase vehicles on credit, they execute a RIC, that specifies the customer's monthly payments and makes clear that if the customer defaults under the RIC the vehicle may be repossessed and sold.

12.      One of the ways Defendants finance their customers' purchase of automobiles is by offering an option to "Buy Here Pay Here" ("BHPH").[1]   The term "Buy Here, Pay Here" refers to a method of financing where an automobile dealership finances a vehicle purchased by its customer and the customer can make their regular monthly payments directly to the automobile dealership.

13.      Agora offers its automobile dealership partners the option to sell the RICs from their BHPH portfolios to Agora in exchange for a negotiated price.

14.      On or about May 23, 2022, Agora and Defendants executed an MRA whereby Defendants agreed to "sell, transfer, assign, set over and otherwise convey to Agora … all right title

---

[1] https://www.track-motors.com/buy-here-pay-here/

and interest in, to and under" several portfolios of RICs originated through Defendants' BHPH program. A redacted copy of the MRA is attached as **Exhibit 1** to the Complaint.

15. Pursuant to the MRA, Defendants sold several portfolios of RICs originated by Defendants to Agora. Once a portfolio of RICS was sold to Agora, all of Defendants' right, title and interest in, to and under the portfolio would be transferred to Agora as of the "Closing Date" as such term is defined in the MRA.

16. As an express condition of the MRA, each portfolio sold to Agora would be classified as a "True Sale" for purposes of the Uniform Commercial Code meaning that at the time of the closing of the purchase, the RICs were purchased by Agora and were no longer property of the Defendants.

17. Beginning in May 2022 and continuing through August 2022, Agora purchased multiple portfolios of Receivables from Defendants. Receivables are defined by the MRA as the RICs or Contracts, subject of the MRA purchased by and transferred to Agora.

18. Specifically, Agora purchased fourteen portfolios ("Portfolios") of Receivables identified as follows: TAM003, TAM004, TAM005, TAM006, TAM007, TAM008, TAM009, TAM010, TAM011, TAM012, TAM014, TAM016, TAM017 and TAM018.

19. Shortly after Agora purchased the foregoing Portfolios, the customers who purchased the vehicles were informed of the sale and assignment of the RICs and were informed where payments should be directed in the future. (The customers are referred to in the MRA as "Obligors").

20. As part of the sale of the Portfolios, Agora took possession of the original RICs executed by the Obligors which evidence the Receivables. Such originals constitute "tangible chattel paper" under the Uniform Commercial Code ("UCC"). Agora's taking possession of the chattel paper perfected the sale as required under the UCC.

21. Agora owns these original RICs and the Receivables.

22.     Agora paid – good and valuable monetary consideration – to Defendants when it, in good faith, purchased the Receivables from Defendants and took possession of the original RICs representing the Receivables in the ordinary course of Agora's business.

23.     Agora, through its agent, Westlake Services LLC ("Westlake"), began servicing the RICs that were sold to Agora.

24.     Notice of the transfer in ownership and servicing was sent to the Obligors using the "Form Notice of Transfer" attached as Exhibit D to the MRA.

25.     The Notice of Transfer specifies to the Obligors where they would make payments on their RICs going forward.  The Notice of Transfer further specifies that the payments were to be made to Westlake.

26.     The MRA contains multiple terms, representations, and warranties made by Defendants in favor of Agora.   The most relevant of which are set forth as follows:

### SPECIFIC TERMS, REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE MRA

27.     Pursuant to Section 2.2 of the MRA governing the Purchase Price:

> "the parties agree that the related Purchase Price shall be satisfied by (a) Agora remitting or causing its agent to remit (a) the amount required to be delivered to the applicable Prior Lender(s), if any, and (2) to [Defendants] the sum of any portion of the related Net Advance Remittance, if any, in excess the amount required to be delivered to the applicable Prior Lender(s), if any, (b) with respect to the related Portfolio sold on the initial Closing Date, transferring the related [Defendants] SUBI Certificate to the [Defendants] and the [Defendants'] acceptance thereof and (c) with respect to the related Portfolio sold on any other Closing Date, by the increase in value of the [Defendants] SUBI Certificate following the sale and allocation of such Portfolio to the applicable SUBI.
>
> With respect to the applicable Closing Date, Agora shall own and be entitled to receive with respect to each purchased Receivable all Collections (whether or not received or recovered) and accruing before the related Cut-Off-Date, including, without limitation, (1) all principal

**LIEBLER, GONZALEZ & PORTUONDO**
Courthouse Tower - 25th Floor, 44 West Flagler Street, Miami, FL 33130    (305) 379-0400

due and owing on the Receivables related to such Portfolio, (2) all Accrued Interest on the Receivables related to such Portfolio; and (3) all other charges or payments due and owing and collections on the Receivables related to such Portfolio, in each case from and after the related Cut-Off Date which such amounts shall be applied pursuant to the Loan and Security Agreement and Trust Agreement for further distribution for the benefit of the [Defendants] SUBI Certificate.

28.     Pursuant to Section 2.6 of the MRA:

[Defendants'] acknowledge[] and agree[] that, consistent with Agora's ownership of any conveyed property after the related Closing Date, Agora shall have the sole right to service, administer and collect the Conveyed Property and to assign or delegate such right to others, including without limitation, the Portfolio Administrator and the Servicer. Notwithstanding the foregoing, [Defendants] and Agora agree that [Defendants] shall maintain "customer service" communications with each Obligor provided, however, that such communications shall not include any attempt to collect or make demands of such Obligor with respect to the related Receivable unless expressly permitted by Agora.

29.     Defendants made multiple representations and warranties regarding the Receivables to Agora in the MRA.   Specifically, under Section 4.2.1 of the MRA, Defendants warranted:

"Each Receivable (A) was originated by [Defendants] or was originated by a third party and purchased by [Defendants], in each case in accordance with [Defendants'] credit policies as of the date of origination or acquisition in the ordinary course of [Defendants'] business and, as applicable, as validly assigned, (B) was originated for the retail sale of a Financed Vehicle in the ordinary course of the [Defendants'] business, or third party's ordinary course of business, as applicable, and was fully and properly executed by the parties thereto, and the [Defendants] or third party, as applicable, had all necessary licenses and permits to originate Receivables in the State where such [Defendants] [were]located, (C) contains customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for realization against the collateral security, and (D) is a Receivable which provides for level monthly payments (provided that the period in the first period and the payment in the final period of the Receivable made by minimally different from the normal period and level payment) which, if made when due, shall fully amortize the Amount Financed over the original term."

30.     Pursuant to Section 4.2.4, Defendants warranted:

LIEBLER, GONZALEZ & PORTUONDO
Courthouse Tower - 25th Floor, 44 West Flagler Street, Miami, FL 33130   (305) 379-0400

"Each Receivable represents the genuine, legal, valid and binding payment obligation of the Obligor thereon, enforceable by the holder thereof in accordance with its terms, except (A) as enforceability may be limited by bankruptcy, insolvency, reorganization or similar laws affecting the enforcement of creditor's rights generally and by equitable limitations on the availability of specific remedies, regardless of whether such enforceability is considered in a proceeding in equity or at law and (B) as such Receivable may be modified by the application after the Cut-Off Date of the Servicemembers Civil Relief Act, the California Military Families Financial Relief Act or similar legislation; and all parties to each Receivable had full legal capacity to execute and deliver such Receivable and all other documents related thereto and to grant security interest purported to be granted thereby."

31.     Additionally, Section 4.2.10, Defendants warranted:

"There is only one original executed copy (or with respect to Electronic Contracts, one Authoritative Copy) of each Contract and there has not ever been any other original or Authoritative Copy of such Receivable."

32.     Pursuant to Section 4.2.15, Defendants warranted:

"Each receivable created or shall create a valid, binding and enforceable first priority security interest in favor of the [Defendants] in the Financed Vehicle. The Certificate of Title for each Financed Vehicle shows, or if a new or replacement Certificate of Title is being applied for with respect to such Financed Vehicle the Certificate of Title will be received within 90 days of the origination of the related Receivable and will show, the [Defendants], or if directed by Agora, such other entity so specified by Agora in its sole discretion named as the original secured party under each Receivable as the holder of a first priority security interest in such Financed Vehicle. With respect to each Receivable for which the Certificate of Title has not yet been returned from the Registrar of Titles, [Defendants] [have]applied for or received written or electronic evidence that such Certificate of Title showing [Defendants] as first lienholder has been applied for and [Defendants'] security interest (assigned by [Defendants] to Agora under the related MRA Supplement) has been validly assigned by the [Defendants] to Agora pursuant to the related MRA Supplement and immediately upon the transfer and assignment of the Receivables to Agora on the Closing Date, Agora shall have good and marketable title to the Receivables and, free and clear of any encumbrance, equity, lien, pledge, charge, claim, security interest or other gith or title of any other Person. As of the Cut-Off Date, there were no Liens or claims for taxes, work, labor

or materials affecting a Financed Vehicle which are or may be Liens prior to equal to the Liens of the related Receivable.

33. Defendants represented to Agora that the vehicles were equipped with a GPS device.

Specifically, Section 6.7 provided:

> "If any Financed Vehicle securing a Receivable is equipped with a started interrupt device, GPS device or other electronic device, designed to aid in the location or repossession of the Financed Vehicle ("Device"), [Defendants] shall, within five (5) days from the related Closing Date, take all steps necessary to transfer and assign to Agora (i) the Device, (ii) all of [Defendants'] rights in connection with the Device, (iii) the Device's records, and (iv) all codes and/or software necessary to administer the Device. To the extent the subscription of any Device has expired, [Defendants] shall, at [Defendants'] sole cost, renew such subscription for any such Device for a one (1) year period following the related Closing Date. [Defendants] shall provide to Obligor and obtain Obligor's valid signature on a disclosure statement regarding the GPS device (which shall be part of the related Receivable file) and [Defendants] shall provide this disclosure statement to the Servicer when delivering the related Receivable File to the Servicer. [Defendants] understands, acknowledges and agrees that the Servicer may administer such Device in accordance with the related Receivable and pursuant to applicable law. [Defendants] unconditionally agrees to activate any Device (thereby disabling or tracking said Financed Vehicle) without the prior written permission of the Portfolio Administrator.

34. Defendants were required to deliver a Receivable File with the originating documents including the vehicle's title. Specifically, Section 3.3 (c) provides:

> "With respect to the acquisition of a Portfolio on the related Closing Date by Agora, [Defendants] shall have, prior to the date that is more than ten (10) Business Days prior to such Closing Date deliver and release to the Servicer (or to such Person as the Portfolio Administrator directs) via overnight delivery the items listed under the related Receivable File with respect to each Receivable sold by [Defendants] to Agora or such Closing Date and set forth on the related Receivables Schedule. If the Portfolio Administrator identifies any Receivable that does not conform to the information set forth in the related Receivables Schedule, such Receivable shall be rejected for purchase, unless waived by the Portfolio Administrator in writing. If not purchased by Agora, such Receivable shall be deleted from the related Receivables Schedule.

**LIEBLER, GONZALEZ & PORTUONDO**
Courthouse Tower - 25th Floor, 44 West Flagler Street, Miami, FL 33130   (305) 379-0400

Agora or the Portfolio Administrator each shall not be required to conduct, or have conducted on its behalf, any such examination. The fact that Agora, the Portfolio Administrator or their respective designee(s) have conducted or have determined not to conduct any partial or complete examination of the related Receivable Files shall not affect any rights to demand repurchase in accordance with Section 6.4 of this Agreement or any other relief or remedy provided for in this Agreement.

35.     The MRA provides under Section 3.3(d):

"In the event [Defendants] fails to deliver to the Servicer (or such Person as the Portfolio administrator directs), with respect to any particular Receivable, the related Receivable File to the reasonable satisfaction of the Portfolio Administrator and in accordance with this Section, the Portfolio Administrator shall provide written notice to [Defendants] of such failure.   If, after five (5) Business Days from the date of receipt of such notice, [Defendants] fails to cure such failure, the Portfolio Administrator may at its sole option require [Defendants] to repurchase such Receivable, [Defendants] shall repurchase such Conveyed Property by paying to Agora the related Repurchase Price in good funds within two (2) Business Days following the Portfolio Administrator's notice hereunder.   In the event [Defendants] is required to repurchase the applicable Conveyed Receivable hereunder, the Portfolio Administrator shall cause the Servicer to deliver to [Defendants], following Agora's receipt of payment from the [Defendants] of the related Repurchase Price, the related Receivable File and shall cause the assignment to [Defendants] all of Agora's right, title and interest in and to the related Conveyed Property, free and clear of any and all claims, liens, and encumbrances, except for those which existed at the time of Agora's purchase thereof from [Defendants]."

36.     Pursuant to Section 5.1(c), Defendants covenanted:

"To the extent [Defendants] or [Defendants'] Servicer receives any Collections in respect of any Conveyed Property after the related Closing Date, [Defendants] shall deliver, and shall direct [Defendants'] Servicer to deliver, as appropriate, directly to such account or otherwise as the Portfolio Administrator may designate, within two (2) Business Days after receipt and identification thereof, any and all such Collections in the form so received, and agrees that all such Collections shall be deemed to be received in trust for Agora and shall be held in trust until such Collections are delivered to the Servicer; provided further [Defendants] or [Defendants'] Servicer shall not comingle such funds prior to delivery to the Servicer hereunder."

**LIEBLER, GONZALEZ & PORTUONDO**
Courthouse Tower - 25th Floor, 44 West Flagler Street, Miami, FL 33130    (305) 379-0400

37.    Pursuant to Section 6.4(c) of the MRA provides that

**[DEFENDANTS] IS STRICTLY PROHIBITED FROM TAKING ANY ACTION OR COMMUNICATING WITH AN OBLIGOR UNTIL THE APPLICABLE STEPS RELATING TO REPURCHASE DESCRIBED IN THIS SECTION 6.4(a) HAVE BEEN COMPLETED AND AGORA HAS REASSIGNED TO [DEFENDANTS] THE VEHICLE TITLE AND RECEIVABLE.   THIS INCLUDES BUT IS NOT LIMITED TO, REPOSSESSION OF THE VEHICLE OR COLLECTION EFFORTS BY [DEFENDANTS] WITH THE OBLIGOR**

38.    Section 7.7 of the MRA provides that the MRA "shall be governed by and construed in accordance with the laws of the state of New York.   However, the individual torts pled below, occurred in the State of Florida and are governed by Florida law.

## DEFENDANTS' POSSESSION OF CUSTOMER PAYMENTS BELONGING TO AGORA

39.    As stated above, after the Closing Date and the transfer of the portfolios from Defendants to Agora, Agora was "entitled to receive with respect to each purchased Receivable all Collections (whether or not received or recovered)" from the portfolios.

40.    Despite these terms, Defendants continued to collect payments from the Obligors, deferred down payments and insurance proceeds (which also belonged to Agora).

41.    The Defendants are in possession of over $58,773.77 in customer payments and $16,340.60 of insurance proceeds.

42.    Each payment received by Defendants from the Obligors after the sale of the Portfolios to Agora must be remitted to Agora.

43.    Defendants failed to notify Agora of receipt of these payments and, to date, have not remitted these payments to Agora as required under the MRA.

## DEFENDANTS' POSSESSION OF VEHICLES WITHOUT NOTIFCATION TO AGORA

**LIEBLER, GONZALEZ & PORTUONDO**
Courthouse Tower - 25th Floor, 44 West Flagler Street, Miami, FL 33130    (305) 379-0400

44.     As stated above, the MRA provides that Agora owns the Receivables comprised of the RICs and the MRA prohibits Defendants from holding financed vehicles that are collateral for the Receivables.

45.     Defendants have come into possession of at least thirty-six (36) vehicles that serve as collateral for the Receivables that Agora purchased.

46.     Defendants failed to notify Agora when the vehicles came into the Defendants' possession.   Agora was notified of Defendants' possession of these vehicles from its servicer, Westlake.

47.     As a result, Agora has been deprived of the proceeds from the sale of the vehicles triggering an additional event of default under the MRA.   As stated above, Agora has also been deprived of customer payments and insurance proceeds in connection with these vehicles.

48.     In addition, Agora has discovered that multiple vehicles securing the Receivables purchased by Agora were improperly repossessed by Defendants and are now missing catalytic converters belonging to Agora.   This greatly impacts the value of the vehicles that serve as collateral for the Receivables that Agora purchased from Defendants.

49.     Agora exercised its right to demand that Defendants repurchase all Portfolios of the Receivables sold to Agora.

### DUPLICATION OF VEHICLE IDENTIFICATION NUMBERS, FAILURE TO DELIVER TITLE & FAILURE TO ASSURE VALID FINANCE TRANSACTIONS

50.     The MRA requires each vehicle that serves as collateral for the portfolio of RICs that are transferred to Agora to have a distinct Vehicle Identification Number ("VIN").

51.     Additionally, the MRA requires a valid certificate of title for each vehicle that serves as collateral for the portfolio of RICs that are transferred to Agora.

**LIEBLER, GONZALEZ & PORTUONDO**
Courthouse Tower - 25th Floor, 44 West Flagler Street, Miami, FL 33130    (305) 379-0400

52.     Despite the foregoing requirements of the MRA, Agora has discovered that at least fifty-six (56) of the vehicles within the Portfolios transferred to Agora do not have a distinct VIN or distinct Obligor tied to such VIN.

53.     Specifically, multiple RICs contained within the Portfolios have the same Obligor – likely as the result of a trade-in or voluntary repossession that occurred before and after the Receivables were purchased.

54.     Agora was not informed of this resulting in Agora purchasing multiple RICs from Defendants that had the same Obligor.

55.     Moreover, Defendants have failed to deliver clear marketable title to multiple vehicles in portfolios purchased by Agora.  Defendants also failed to deliver to Agora title with the Receivable files for multiple vehicles in the Portfolios.  Defendants were provided with multiple notices of these failures prior to the filing of this lawsuit and Defendants failed to cure these failures.

56.     The MRA further requires that each Receivable purchased by Agora be the result of an actual vehicle purchase transaction by a customer of Defendants.

57.     Agora has discovered multiple instances where Receivables that were transferred to Agora were not closed and/or did not result in the sale of the vehicle to the Obligor.

58.     Each of the foregoing events constitutes a breach of the MRA, and Defendants are required to repurchase these Receivables from Agora.  Additionally, Defendants are required to remit the payoff amounts due for the repurchase of these Receivables.

## DEFENDANTS' FAILURE TO TRANSFER GPS DEVICES

59.     As stated above, the MRA requires Defendants to transfer all GPS devices with which a Financed Vehicle – as defined in the MRA – is equipped.

60.     Defendants have five (5) days from the date the portfolios are purchased and transferred to Agora to transfer the GPS devices.

61.     Defendants represented to Agora that all vehicles that serve as security for the Receivables were equipped with GPS tracking devices.

62.     Defendants failed to transfer the GPS devices for multiple Financed Vehicles.

63.     Defendants' failure to do so significantly impacts Agora and Westlake's ability to ensure proper servicing of the vehicles resulting in damages to Agora.

64.     Additionally, failure to transfer the GPS devices has also allowed Defendants to accept voluntary repossessions of vehicles without Agora's knowledge which has resulted in the Defendants' secreting of its breaches of the MRA.

65.     Agora made demand on the Defendants in July of 2022 to fulfill its obligations to transfer the GPS devices.   Defendants failed to do so.

## IMPROPER SOLICITATIONS FROM CUSTOMERS AND FALSE REPRESENTATIONS CONCERNING CONSUMER CREDIT AND VOLUNTARY REPOSSESSIONS

66.     As a material term of the MRA, under Section 5.2(f), Defendants may not "solicit, encourage, or otherwise suggest an Obligor in any manner breach any term of the Contract related to a Receivable."

67.     Further, under Section 5.2(g), Defendants may not "contact any or communicate with any Obligor regarding such Obligor's obligations under a Receivable including, without limitation, communicate with or threaten any Obligor into believing the Financed Vehicle can be repossessed as related to any collateral protection insurance obligations of such Obligor."

68.     Despite these very clear and unambiguous terms, Defendants have, on at least one occasion, advised an Obligor to return a vehicle, which serves as collateral for a Receivable purchased

**LIEBLER, GONZALEZ & PORTUONDO**
Courthouse Tower - 25th Floor, 44 West Flagler Street, Miami, FL 33130    (305) 379-0400

by Agora, to Defendants as a voluntary repossession.   Defendants also advised the Obligor that the voluntary repossession would not impact its credit.

69.     For example, on May 2, 2022, an Obligor contacted Defendants via email requesting information concerning the implications of returning the vehicle.   Specifically, the Obligor asked:

**"Now my question is will this mess up my credit when they take the car back?"**

70.     In response Defendants stated:

**"It was actually me that you were speaking with and to answer your question, no there will be no repercussions for voluntarily surrendering your vehicle. We have received the vehicle back, canceled your pending registration with the State of Florida and your account will be closed with Track Motors."**

A copy of the redacted email correspondence is attached as Exhibit 2.

71.     This was a false statement.   In fact, a simple Google search of the impact of a voluntary repossession reveals that not only does a voluntary repossession continue to impact an individual's credit report but that money would still be owed under the Retail Instalment Sales Contract to the lender.[2]

72.     Not only do such communications breach multiple terms of the MRA, but Defendants failed to disclose these communications to Agora or report to Agora that the vehicle was returned to Defendants.

73.     These communications interfere with Agora's relationships with its Obligors and Agora's ability to properly service the Receivables resulting in damages to Agora and potentially to the Obligor.   These communications also evidence a deceptive and misleading business practice by Defendants where the Defendants take advantage of the customers and capitalize on Defendants'

---

2 https://www.creditkarma.com/auto/i/voluntary-repossession

**LIEBLER, GONZALEZ & PORTUONDO**
Courthouse Tower - 25th Floor, 44 West Flagler Street, Miami, FL 33130    (305) 379-0400

ability to re-sell a vehicle that was voluntarily repossessed by Defendants before and/or after Defendants sell the corresponding RICs to Agora.

74.     On September 29, 2022, Agora sent to Defendants a Demand for Payment of Amounts Due and to Cease and Desist Actions outlining the multiple breaches set forth above and demanding immediate possession of the vehicles to Agora, turnover of all contract and insurance proceeds due to Agora, immediate cessation of servicing, remittance of the payoff amounts due for the Receivables repurchased by Defendants, administering and collection activity related to the vehicles subject to the portfolios transferred to Agora.

## COUNT I
## BREACH OF MRA

75.     Agora realleges and re-avers paragraphs 1 through 74 above, as if fully set forth herein.

76.     As stated above, the parties executed the MRA that would govern the sale of receivables from Defendants to Agora.  Defendants made multiple promises, representations and warranties in connection with the MRA.

77.     Defendants materially breached multiple terms of the MRA including, without limitation, sections 2.2, 2.6, 4.2.1, 4.2.4, 4.2.10, 4.2.15, 6.7, 3.3, 5.1 and 6.4 as detailed above.

78.     Agora has been materially damaged by these breaches including but not limited to Defendants' diversion of customer payments to itself, the disruption of Agora's ability to properly service the Receivables, Defendants' failure to repurchase the Receivables despite Agora's demand, Defendants' failure to secure marketable title to the vehicles jeopardizing the security interest in the vehicles, Defendants' failure to secure GPS devices to the vehicles, Defendants' failure to remit the total amount of the Receivables and insurance proceeds owed to Agora, Defendants deprivation of Agora and the Obligor's rights to the vehicles that secure the Receivables, damages for failure to remit the payoff amounts of the vehicles repurchased by Defendants, the potential legal claims the

**LIEBLER, GONZALEZ & PORTUONDO**
Courthouse Tower - 25th Floor, 44 West Flagler Street, Miami, FL 33130    (305) 379-0400

Obligors may have against Agora and its servicer as a result of Defendants' actions and the attorney's fees and costs in bringing the instant complaint.

79.     **WHEREFORE,** Plaintiff, Agora, demands judgment for damages against Defendants together with interest, late charges, penalties, consequential damages, special damages, costs and attorneys' fees and for any other relief this Court deems just and proper.

## COUNT II
## SPECIFIC PERFORMANCE

80.     Plaintiff re-alleges and re-avers paragraphs 1 through 74 above, as if fully set forth herein.

81.     This is an action for specific performance of the MRA executed by the parties.

82.     On May 23, 2022, Plaintiff and Defendants entered into a written contract for the sale and purchase of the Receivables as defined above from Defendants to Agora.

83.     Defendants breached multiple terms of the MRA.

84.     Defendants have failed to tender to Agora payments made to Defendants by the Obligors under the Receivables.   Specifically, Defendants are in possession of payments from Obligors exceeding $58,773.88 that should have been remitted to Agora.   Additionally, Defendants are in possession of payments from insurers exceeding $16,340.60 that should have been remitted to Agora.   Defendants have failed to remit these payments despite Agora's demand.

85.     Defendants are in possession of multiple vehicles that serve as collateral to the Receivables Agora purchased.   These vehicles have not been transferred to Agora despite Agora's demand.

86.     Defendants have failed to secure marketable title to multiple vehicles that serve as collateral to the Receivables Agora purchased.   Defendants' failure to do so causes continuing material damages to Agora and impairment of Agora's ability to properly service the RICs.

16

87.     Defendants have failed to transfer the GPS devices of the vehicles that serve as collateral to the Receivables Agora purchased.   This similarly has resulted in continuing damages to Agora and impairs Agora's ability to service the RICs.

88.     Defendants have, on at least one occasion, advised an Obligor to return a vehicle, which serves as collateral for a Receivable Agora purchased, to Defendants as a voluntary repossession.  Defendants also advised the Obligor the voluntary repossession would not impact their credit.   These are false statements and result in material damages to Agora and potentially to the Obligors.

89.     On September 29, 2022, Agora sent Defendants a Demand for Payment of Amounts Due and for specific performance of the foregoing obligations under the MRA.

90.     Defendants refused to cooperate with Agora and failed to comply with Agora's demand.

91.     **WHEREFORE,** Plaintiff, Agora, seeks a final judgment for specific performance requiring Defendants to:

    1)     Repurchase all of the Retail Instalment Sales Contracts pledged to Agora, or, in the alternative:

    2)     The transfer of all GPS devices to the vehicles subject to the Receivables sold to Agora;

    3)     The transfer of marketable title to all vehicles subject to the Receivables sold to Agora;

    4)     The immediate transfer of all vehicles subject to the Receivables sold to Agora to Ft. Lauderdale Manheim action at Defendants' expense

**LIEBLER, GONZALEZ & PORTUONDO**
Courthouse Tower - 25th Floor, 44 West Flagler Street, Miami, FL 33130    (305) 379-0400

5)      Transfer of all payments held by Defendants received from the Obligors and

insurers concerning the vehicles subject to the Receivables sold to Agora;

**COUNT III**
**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**

92.     Agora re-alleges and re-avers paragraphs 1 through 74 above, as if fully set forth

herein.

93.     To state a claim for tortious interference with a business relationship, a plaintiff must

show: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable

contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and

unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a

result of the breach of the relationship." *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127

(Fla. 1985).[3]

94.     There exist numerous business relationships between Agora and the Obligors.   As

discussed above, Agora purchased portfolios of Receivables which comprised of Retail Installment

Sales Contracts between Defendants and individuals who purchased vehicles from the Defendants.

95.     As of the date of purchase, all right title and interest in, to and under the Retail

Instalment Sales Contracts were transferred to Agora.   Agora's agent, Westlake, began servicing

the Retail Instalment Sales Contracts.

96.     Defendants are undoubtedly aware of Agora's relationships with the Obligors

because Defendants sold the Receivables to Agora by virtue of the MRA.

97.     Defendants intentionally interfered with Agora's relationships with the Obligors by:

---

3 Florida courts have determined tortious interference with a business relationship and tortious interference with a
contract are nearly identical causes of action, with the "only material difference" being "in one there is a contract and in
the other there is only a business relationship." *Smith v. Ocean State Bank*, 335 So. 2d 641, 642 (Fla. 1st DCA 1976).

**LIEBLER, GONZALEZ & PORTUONDO**
Courthouse Tower - 25th Floor, 44 West Flagler Street, Miami, FL 33130    (305) 379-0400

(a) Failing to tender to Agora payments made to Defendants by the Obligors under the Receivables;

(b) Failing to tender payments received from insurers;

(c) Maintaining possession of multiple vehicles that serve as collateral to the Receivables purchased by Agora;

(d) Failing to secure marketable title to multiple vehicles that serve as collateral to the Receivables purchased by Agora.

(e) Failing to transfer the GPS devices of the vehicles that serve as collateral to the Receivables purchased by Agora.

(f) Advising Obligors that returning a vehicle would not impact their credit.

98.     The Defendants' conduct is unjustified because it is expressly prohibited by the MRA and potentially causes harm to the Obligors that Agora seeks to service.

99.     Additionally, Defendants' actions have interfered with and resulted in the breach of numerous RICs between Agora and Obligors including, but not limited to, Obligors' failure to maintain possession of the vehicles, failure to make payment under the RICs, jeopardizing Agora's interest in the vehicles, selling or transferring the vehicles without consent, not notifying Agora of losses or damage to the vehicles.

100.     Agora has been materially damaged by these actions including but not limited to Defendants' diversion of customer payments to itself, the disruption of Agora's ability to properly service the Receivables, Defendants' failure to repurchase the receivables despite Agora's demand, Defendants' failure to secure marketable title to the vehicles jeopardizing the security interest in the vehicles, Defendants' failure to secure GPS devices to the Vehicles, Defendants' failure to remit the total amount of the receivables owed to Agora and the insurance proceeds owed to Agora, Defendants

**LIEBLER, GONZALEZ & PORTUONDO**
Courthouse Tower - 25th Floor, 44 West Flagler Street, Miami, FL 33130    (305) 379-0400

deprivation of Agora and the Obligor's rights to the vehicles that secure the Receivables, the Obligor's breaches under the RICs, the potential legal claims the Obligors may have against Agora and its servicer as a result of Defendants' actions and the attorney's fees and costs in bringing the instant complaint.

101.    **WHEREFORE,** Plaintiff, Agora, demands judgment for damages against Defendants together with interest, late charges, penalties, consequential damages, special damages, costs and attorneys' fees and for any other relief this Court deems just and proper.

### COUNT IV
### VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

102.    Agora re-alleges and re-avers paragraphs 1 through 74 above, as if fully set forth herein.

103.    In order to state a claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") a consumer must plead: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Rollins, Inc. v. Butland,* 951 So.2d 860, 869 (Fla. 2d DCA 2006); *Washington v. LaSalle Bank Nat. Ass'n*, 817 F. Supp. 2d 1345, 1350 (S.D. Fla. 2011)

104.    Defendants have, on at least one occasion, and without notifying Agora, advised an Obligor to return a vehicle that serves as collateral for a Receivable purchased by Agora, to Defendants as a voluntary repossession.

105.    Defendants also advised the Obligor that the voluntary repossession would not impact their credit.

106.    Specifically, on May 2, 2022, an Obligor contacted Defendants via email requesting information concerning the implications of returning the vehicle.   Specifically, the Obligor asked:

**"Now my question is will this mess up my credit when they take the car back?"**

107.    In response Defendants stated:

**LIEBLER, GONZALEZ & PORTUONDO**
Courthouse Tower - 25th Floor, 44 West Flagler Street, Miami, FL 33130    (305) 379-0400

> **"It was actually me that you were speaking with and to answer your question, no there will be no repercussions for voluntarily surrendering your vehicle. We have received the vehicle back, canceled your pending registration with the State of Florida and your account will be closed with Track Motors."**

A copy of the redacted email correspondence is attached as Exhibit 2.

108.    This was a false and deceptive statement.  In fact, a simple Google search of the impact of a voluntary repossession reveals that not only does a voluntary repossession continue to impact an individual's credit report but also that money would still be owed under the Retail Instalment Sales Contract to the lender.[4]

109.    After making these false misrepresentations to the Obligor, the Defendants included this RIC in the portfolio of loans sold to Agora.

110.    Agora has been materially damaged by these actions including but not limited to the disruption of Agora's ability to properly service the Receivable, Defendants deprivation of Agora and the Obligor's rights to the vehicles that secure the Receivables and the potential legal claims the Obligors may have against Agora and its servicer as a result of Defendants' actions and the attorney's fees and costs in bringing the instant complaint.

111.    **WHEREFORE,** Plaintiff, Agora, demands judgment for damages against Defendants together with interest, late charges, penalties, consequential damages, special damages, costs and attorneys' fees and for any other relief this Court deems just and proper.

## <u>COUNT V</u>
## <u>PRELIMINARY INJUNCTION</u>

112.    Plaintiff re-alleges and re-avers paragraphs 1 through 74 above as if fully set forth herein.

---

4  https://www.creditkarma.com/auto/i/voluntary-repossession

**LIEBLER, GONZALEZ & PORTUONDO**
Courthouse Tower - 25th Floor, 44 West Flagler Street, Miami, FL 33130    (305) 379-0400

113.     This is an action for a preliminary injunction.   Pursuant to Rule 65, the Court may issue a preliminary injunction if Plaintiff demonstrates that (i) there is a substantial likelihood of success on the merits, (ii) a substantial threat of irreparable injury, (iii) that the threatened injury to the plaintiff outweighs the potential harm to the defendant and (iv) that the injunction will not disserve the public interest.  *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002).

114.     All of the elements for the imposition of a preliminary injunction are present here.

115.     Agora submits that there is a substantial likelihood of success on the merits because, as detailed above, Defendants are engaged in continuing breaches of the MRA and interference with Agora's business relationships with the Obligors that causes great detriment to Agora but also to the individuals who purchased the vehicles from defendants.

116.     The Defendants' conduct is unjustified because it is expressly prohibited by the MRA.

117.     There is a substantial threat of irreparable injury to Agora and to the Obligors.   Agora is being continually harmed by being deprived of the vehicles securing the Receivables it purchased by, including and without limitation Defendants':

(a) Failing to tender to Agora payments made to Defendants by the Obligors under the Receivables;

(b) Failing to tender payments received from insurers;

(c) Maintaining possession of multiple vehicles that serve as collateral to the Receivables purchased by Agora;

(d) Failing to secure marketable title to multiple vehicles that serve as collateral to the Receivables purchased by Agora.

(e) Failing to transfer the GPS devices of the vehicles that serve as collateral to the Receivables purchased by Agora.

**LIEBLER, GONZALEZ & PORTUONDO**
Courthouse Tower - 25th Floor, 44 West Flagler Street, Miami, FL 33130    (305) 379-0400

(f)  Advising Obligors that returning a vehicle would not impact their credit.

118.    Absent an injunction, Agora has no adequate remedy at law and will suffer irreparable harm, which is presumed under Florida law because of Agora's claim for tortious interferences of a business relationship.   *Special Purpose Accounts Receivable Cooperative Corporation v. Prime One Capital Company, LLC* 125 F. Supp.2d 1093, 1105 (S.D. Fla. 200) ("…irreparable injury is presumed in cases involving tortious interference with business relationship").

119.    Defendants will not be harmed by the requested injunction.  The granting of the temporary injunction will merely keep the parties bound to the terms of the MRA that they negotiated and agreed to.   Moreover, the conduct enjoined will prohibit further harm to third party Obligors.

120.    The injunction sought will serve the public interest because it seeks to protect the interests of third-party Obligors as well as Agora's during the pendency of this lawsuit. Indeed, the requested injunction will help restore the certainty to the types of receivable financing transactions involved here, including assuring consumers of financed vehicles that are subject of such transactions that their vehicles will not be wrongfully repossessed.

121.    **WHEREFORE,** Plaintiff, Agora, seeks an order granting Agora's request for preliminary injunction requiring Defendants to:

1)    Enjoin Defendants from taking cars without a full payoff to Agora;

2)    Enjoin Defendants from advising customers to voluntary repossess their vehicles and then selling them another vehicle;

3)    Enjoin Defendants from selling a customer currently on a contract with Agora another car without payoff

4)    Enjoin Defendants from accepting and or collecting consumer payments and insurance checks from consumers on an account with Agora

**LIEBLER, GONZALEZ & PORTUONDO**
Courthouse Tower - 25th Floor, 44 West Flagler Street, Miami, FL 33130    (305) 379-0400

5)      Enjoin Defendants to direct all customers to Agoras servicer for payments

6)      Enjoin Defendants to direct all insurance companies to Agoras servicer for payments

7)      Enjoin Defendants from transferring or releasing any liens on vehicles securing Receivables sold to Agora

8)      Enjoin Defendants from communicating with consumers other than normal customer service unrelated to the servicing of the Retail Installment Sales Contracts.

### **DEMAND FOR ATTORNEY'S FEES**

Agora hereby demands its attorney's fees and costs in connection with the institution of this lawsuit as provided by the MRA and Florida law.

### **VERIFICATION**

**Under penalty of perjury under the laws of the United States, I declare that I have read the foregoing, and that the facts alleged therein are true and correct.   I understand that a false statement in this Verification will subject me to penalties of perjury.**

_____
**Chris Hawke**
**Chief Financial Officer / Chief Legal Officer**
**Agora Data Inc.**

Respectfully submitted,

**LIEBLER, GONZALEZ & PORTUONDO**
*Attorneys for Agora Data Inc.*
Courthouse Tower – 25th Floor
44 West Flagler Street
Miami, FL   33130
Telephone:   (305) 379-0400
E-Mail:   service@lgplaw.com

By: /s/ James R. Liebler, II, Esq._____

J. RANDOLPH LIEBLER
Florida Bar No. 507954
JAMES R. LIEBLER, II
Florida Bar No. 115348

**LIEBLER, GONZALEZ & PORTUONDO**
Courthouse Tower - 25th Floor, 44 West Flagler Street, Miami, FL 33130    (305) 379-0400